CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 09 2009

JOHN F. CORCORAN, CLERK
BY: _____
      DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **Criminal Case No. 5:04cr30045-1** |
| | ) | **28 U.S.C. § 2255 Motion** |
| | ) | **(Civil Action No. 5:08cv80023)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LANCE O. PORTER** | ) | **By: Hon. Michael F. Urbanski** |
| | ) | **United States Magistrate Judge** |

## REPORT AND RECOMMENDATION

Petitioner Lance O. Porter ("Porter") filed this pro se action as a motion to vacate, set aside, or correct sentence, pursuant to 28 U.S.C. § 2255. Alleging ineffective assistance of counsel, Porter challenges his convictions of possession of marijuana with intent to distribute and possession of a firearm in furtherance of a drug trafficking crime. On November 21, 2008, this matter was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) to conduct appropriate proceedings and submit a Report and Recommended Disposition as to Porter's claims. Upon review of the record, the undersigned finds no grounds on which Porter is entitled to relief under § 2255, and **RECOMMENDS** denial of this petition in its entirety.

### I. FACTUAL AND PROCEDURAL SUMMARY

The trial court's published opinion on Porter's suppression motion found the following facts:

> On April 7, 2002, at 3:47 p.m., the Winchester Police Department dispatcher transmitted a radio call regarding the activation of a home security alarm at 552 Allston Circle, the residence of defendant Lance O. Porter. Officers Brunson and Christensen of the Winchester Police Department received separate

radio calls from the police dispatcher and each individually responded to the scene. Officer Brunson was first to arrive, approximately five to ten minutes after the original radio transmission.

The residence at 552 Allston Circle, an end unit townhouse with one front door and one back door, is located in a residential neighborhood. The information provided to the officers in the dispatcher's radio call indicated that the alarm was activated by the rear door to the home. At the time of Officer Brunson's arrival, there was no audible alarm sounding at the home.[1] As Officer Brunson approached the front door to begin a survey of the home, a neighbor, later identified as Mr. Barry Sutton, emerged from the adjacent townhouse, 548 Allston Circle. Sutton approached Officer Brunson and explained that a young, female child from the neighborhood opened the rear door of 552 Allston Circle possibly activating the alarm. Sutton told the officers that he observed the child open the door from his backyard, during a luncheon cookout in his backyard. Mr. Sutton explained that the child's mother then pulled her away from the door and that he subsequently heard the alarm activate. Sutton's backyard lies immediately adjacent to the defendant's backyard, with the two properties partially separated by a fence line.

After listening to the account of the incident given by Mr. Sutton, Officer Brunson surveyed the front door area of the defendant's townhouse and found no signs of forced entry or other unusual circumstances. He knocked on the front door, but received no response. Officer Brunson then proceeded to the rear door of the house with Officer Christensen who had just arrived at the scene. Upon their arrival at the rear of the house, Ms. Brianna Nei, of 544 Allston Circle, emerged from the back of Mr. Sutton's residence at 548 Allston Circle and spoke with Officer Brunson. Nei explained that it was her two-year-old daughter, Ariel, who had accidentally opened the rear door to 552 Allston Circle. Ms. Nei stated that she and her daughter were present at Mr. Sutton's cookout with other neighborhood families. Officer Brunson, however, observed no obvious signs of a party in the neighbor's backyard. Upon surveying the rear entrance to 552, the officers found the back door closed, but unlocked with no signs of forcible entry.

---

[1] The court noted: "The testimony offered by Mr. Barry Sutton indicates that the alarm was audible at the time of Officer Brunson's arrival. The weight of the evidence, however, supports the court's finding that neither of the police officers heard an audible alarm at any time." United States v. Porter, 288 F. Supp. 2d 716, 718 n.1 (W.D. Va. 2003).

Case 5:04-cr-30045-GEC   Document 106   Filed 03/09/09   Page 2 of 37   Pageid#: 652

Officer Brunson and Officer Christensen proceeded to enter the residence at 552 Allston Circle through the rear door. Upon their entry, Officer Brunson announced his presence but received no response. The officers then conducted a sweep of the entry level of the home to determine if a crime was in progress or if there was anyone inside in need of assistance. Finding no one, Officer Brunson proceeded upstairs to the first floor of the home, where he observed clear plastic bags containing a green plant substance resembling marijuana on the kitchen table and on a nearby couch. Officer Brunson next ascended the stairs to the second floor of the home and observed substantial quantities of U.S. paper currency on top of a dresser. The sweep of the inside of the home lasted approximately five minutes. After this preliminary sweep, finding no one present inside the home, the officers exited the residence. Officer Christensen remained immediately outside the home to secure the front door. Meanwhile, Officer Brunson contacted his supervising officers, Sergeant Danielson and Lieutenant Griffith, and waited for instructions to follow.

During this time, the defendant arrived at his home accompanied by an unidentified female. Sergeant Danielson arrived at the scene shortly thereafter. Sergeant Danielson asked the defendant to consent to a search of his home, but the defendant declined. Lacking the defendant's consent to conduct a search, Officer Brunson and Sergeant Danielson departed to obtain a warrant to search the defendant's residence. The search warrant was successfully obtained, and Sergeant Danielson and Officer Brunson returned to the defendant's home to execute and to serve the warrant. The search revealed eighteen bags of marijuana (weighing in total approximately one ounce), a handgun, weight scales, three thousand dollars in U.S. currency, and plastic wrap coated in motor oil or grease.

United States v. Porter, 288 F. Supp. 2d 716, 718-19 (W.D. Va. 2003).

Based on evidence seized pursuant to the search warrant on April 7, 2002, officers placed Porter under arrest. Porter was charged in state court, but that prosecution was nol prossed after a pretrial ruling by the Circuit Court for the City of Winchester suppressing the evidence obtained from the search of Porter's residence. Porter was subsequently charged in a federal

3

indictment with possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). Porter filed a pretrial motion to suppress the evidence seized from his residence, arguing that the officers' initial, warrantless entry into the home was unreasonable, in violation of the Fourth Amendment. On August 15, 2003, the late Honorable James H. Michael, Jr., Senior United States District Judge, conducted a hearing on Porter's motion to suppress, hearing testimony from witnesses for the government and the defense. After soliciting additional briefs from the parties, the court issued a published opinion and order on October 24, 2003, denying the motion to suppress on the ground that as exigent circumstances justified the warrantless entry, exclusion of the evidence was not required. Id. at 722.

The trial date was continued a couple of times thereafter, and Porter's Criminal Justice Act ("CJA") counsel changed from Paul H. Thomson to Gary Lance Smith on March 25, 2004. On May 26, 2004, Porter's new counsel filed a motion to dismiss the indictment due a Speedy Trial Act violation. Argument was held on the motion on June 9, 2004, at which time the court indicated that the Speedy Trial Act was violated, and the indictment would be dismissed without prejudice. The court advised counsel that when the case was indicted again that a trial date would be set quickly and counsel needed to be prepared to proceed. The court noted that it would not grant any further continuances. By Order dated July 1, 2004, the court granted the motion and dismissed the indictment without prejudice.

Meanwhile, Porter was federally indicted a second time on the same marijuana and gun charges on June 23, 2004. No suppression motion was filed in the second case, and review of the

4

docket sheet and hearing transcripts reveals nothing to suggest that the ruling on the suppression motion in the first case was adopted, incorporated, or otherwise made part of the second case.

In November 2004, Judge Michael conducted a two-day jury trial.[2] At trial, Porter did not contest his possession of the marijuana and instead focused his defense solely on the gun charge. Indeed, Porter admitted that the marijuana was in his house, and that he had obtained it from a friend in Baltimore. Porter had intended to get rid of it by selling it, but decided not to do so as it was poor quality "garbage weed." Porter denied that the pistol he had in his townhouse was bought for drug dealing, but rather was used only for target and sport shooting. On November 19, 2004, a jury found Porter guilty of both the drug and gun charges, and, on December 12, 2005, the court sentenced Porter to 78 months imprisonment. Consistent with his trial strategy focusing solely on the gun charge, Porter appealed only the § 924(c) conviction on grounds that the evidence was not sufficient to support a finding that he possessed the firearm in furtherance of a drug trafficking offense. The United States Court of Appeals for the Fourth Circuit subsequently affirmed Porter's conviction. See United States v. Porter, 206 Fed. App'x 260 (4th Cir. Nov. 17, 2006) (unpublished).

Porter timely filed this § 2255 motion, alleging the following four grounds for relief: (a) counsel failed to appeal the court's use of an Allen[3] charge to the jury; (b) counsel failed to appeal the result of the suppression hearing; (c) counsel failed to honor Porter's request to petition for certiorari to the Supreme Court of the United States; and (d) counsel failed to argue

---

[2] Judge Michael presided over the trial but, pursuant to Fed. R. Crim. P. 25(b)(1), sentencing was conducted by the Honorable Glen E. Conrad.

[3] See Allen v. United States, 164 U.S. 492 (1896).

Case 5:04-cr-30045-GEC   Document 106   Filed 03/09/09   Page 5 of 37   Pageid#: 655

effectively the lack of evidence relating the firearm to the marijuana. The government filed a motion to dismiss, and petitioner responded. In his response, Porter raises an additional claim, alleging that (e) the trial court erred with respect to other jury instructions and in its response to a note from jurors during deliberations. By memorandum opinion and order entered June 19, 2008, the court denied the government's motion,[4] determining that additional fact finding was necessary.

On June 19, 2008, the court referred the case to the undersigned Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), as to claim (c), regarding counsel's failure to file a certiorari petition on Porter's behalf. The court appointed a Federal Public Defender to represent Porter, and a hearing date was set for September 17, 2008. However, on September 16, 2008, the undersigned Magistrate Judge granted Porter's motion to withdraw claim (c) concerning the certiorari claim.

After further consideration by the district court, the case was again referred to the undersigned Magistrate Judge on November 21, 2008 to address certain factual questions regarding the procedural history of the case, namely whether a suppression motion was made in the prosecution of the second indictment which was somehow not reflected in the record.

On November 24, 2008, the undersigned ordered transcription of all pretrial hearings and other proceedings related to the trial on the second indictment. Upon review, these transcripts shed no light on the question of whether a suppression motion was made as regards the second

---

[4] The court construed the government's motion as one seeking summary judgment because attached were "an affidavit from defendant's former counsel, transcripts from defendant's trial, and other supporting documentation." (6-19-08 Mem. Opinion at 1, Dkt. No. 82).

6

indictment, or whether the court's prior ruling was somehow adopted or otherwise incorporated in the second case.

On February 10, 2009, an evidentiary hearing was held in this case, at which both Porter and his former counsel, Gary Smith, testified. At the outset of the hearing, habeas counsel for Porter explained his understanding of the procedural posture of the case as follows: When the speedy trial issue arose, Porter's then CJA counsel, Paul Thomson, thought he may have to become a fact witness as regards communications with the United States and withdrew from his representation of Porter. Gary Smith was then appointed as CJA counsel for Porter. Habeas counsel for Porter advised that he had reviewed the contents of Gary Smith's file and there was no reference to anything concerning an agreement with the United States or a request made to the court regarding preservation of the suppression motion in the prosecution under the second indictment. Counsel for the United States represented as well that he had reviewed the United States' file and there was no reference to a suppression motion in the prosecution under the second indictment.

Porter testified that after the ruling was received on the suppression motion, his then counsel, Paul Thomson, told him that all of the evidence would be received at trial. Porter asked Thomson to appeal the ruling to the Fourth Circuit, and Thomson told him that he would look into it. Porter indicated that Thomson never told him when he could appeal the suppression decision, and Thomson withdrew from representing Porter before he could answer this question. Porter was represented by Gary Smith on the second indictment, and Porter testified that he had a conversation with Smith about the suppression motion shortly after Smith took over as counsel. Porter testified that Smith told him that the suppression motion was not a "winnable" issue.

7

Porter did not have a conversation with Smith about the need to file a new suppression motion, as he thought that it carried over from the earlier case. Porter's defense at trial focused on the gun charge, and his discussions with Smith after the trial about an appeal likewise concerned the gun charge. Porter testified that the issue of the suppression motion never came up again as all of their focus was on the gun charge. Smith mailed Porter a copy of the appellate brief before it was filed, which did not mention the suppression issue. When commenting on the draft brief, Porter did not bring up the suppression issue with Smith as it slipped his mind and because he knew that Smith thought it was not "winnable."

Gary Smith testified that prior to the evidentiary hearing he reviewed a box of documents concerning Porter's case, spoke with Porter's former counsel, Thomson, and with Smith's twin brother who assisted Smith with Porter's appeal. Smith stated that he recalled meeting with Thomson and Porter shortly after he was appointed and going over with them the evidence and the suppression issue. Specifically discussed was the ruling by Winchester Circuit Court Judge Wetzel in the state case suppressing the evidence from the search of Porter's townhouse. Smith testified that he, Porter, and Thomson met three or four times on these issues. Smith and Porter also traveled to Winchester to meet with Thomson after the first day of trial. Smith called Porter the Saturday morning after the trial and spoke to him again before the appeal was filed. Smith confirmed that he sent Porter a draft of the appeal and had two conference calls with Porter regarding the appeal. Smith stated that he thought the best argument on appeal was the sufficiency of the evidence on the gun charge.

Smith had no recollection of any discussion with the United States concerning the suppression issue after the second indictment was filed. Smith recalled no direct conversations

8

with the United States concerning preservation of the suppression issue for appeal, and noted that he knew that had he wanted to preserve that issue for appeal, he needed to do so in the second case by filing a new suppression motion or getting the United States to agree to adopt the suppression motion from the previous case. Smith recalled that the suppression issue came up in the second case only briefly during a conversation in chambers with Judge Michael, Assistant United States Attorney ("AUSA") Rusty Fitzgerald and Smith while the jury was out. Smith stated that "I do vaguely recall the court informing me that that issue had been decided."

Smith testified that he made a conscious decision not to file a suppression motion as regards the second indictment. Smith stated that he reviewed Judge Michael's opinion and case law and talked with Porter's former counsel Thomson, who had the "clear view that the federal case law was moving towards allowing this evidence in." Both Thomson and Smith concluded that the suppression motion was not a strong argument. Smith stated that Porter was "right there, and he knew what we were thinking." After talking with Thomson and Porter, the strategy was developed to try to separate the marijuana from the gun. Smith said that the gun was the big issue, and that Porter told the jury that he had the gun, but that it had nothing to do with the marijuana.

Smith testified that he felt the suppression issue was not "winnable" on appeal, and that this decision impacted whether to make it part of the record in the second case. Smith stated that "had we wanted to appeal the suppression ruling, we would have made it part of the record." Certainly, Smith felt that Judge Michael's opinion would not change. Smith stated that Porter's concern always was the § 924(c) charge, and that Porter felt there was no nexus between the gun and the marijuana. Smith stated that his client understood that their strategy was to focus on the

9

gun charge, and that his client was active in his defense and understood and agreed to this strategy. Smith said that Porter did not indicate to him that he wanted him to raise the suppression motion.

On cross-examination, Smith was asked why he did not order and read the transcript of the suppression hearing. Smith explained that he thought the suppression motion would not be successful based on his review of the court's opinion, the motions filed, and his conversations with Porter's former counsel. Smith was asked whether it would have made a difference to him in deciding whether to raise the suppression issue on appeal if he had learned that there was evidence presented at that hearing that it was the policy of the Winchester police department to go into each home where a burglar alarm sounds and that Judge Michael's opinion made no reference to this evidence. Smith responded by stating that he did not deem it necessary to obtain the suppression hearing transcript because of his in-depth discussions with Thomson, who handled the suppression hearings both in state and federal court. Based on his contacts and relationship with Thomson, Smith was comfortable that Thomson had apprised him of all of the important issues.

At the end of the day, Smith stated that if he wanted to raise the suppression issue on appeal, he knew he had to raise it in the case on the second indictment. Smith stated that he made an affirmative strategic decision not to pursue the suppression motion after reviewing the court's opinion, reviewing the suppression motion briefs, and talking to counsel. Smith acknowledged in retrospect that perhaps it would have been better to preserve the suppression issue and appeal it, so as to avoid this ineffective assistance of counsel claim, but that he really did not feel it was meritorious and felt that his efforts should be concentrated on defending the

10

gun charge. Nevertheless, Smith stated that "it would have been a whole lot simpler to make the argument rather than go through what I have gone through with this."

## II. LEGAL STANDARDS

### A. Section 2255

Prisoners in federal custody may attack the validity of their sentences pursuant to 28 U.S.C. § 2255. In order to move the court to vacate, set aside or correct a sentence under § 2255, a petitioner must prove that one of the following occurred: (1) his sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose such a sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255. To prevail on a § 2255 motion, a petitioner bears the burden of proof by a preponderance of the evidence. Miller v. United States, 261 F.2d 546, 547 (4th Cir. 1958).

Ordinarily, the district judge who presided over the criminal proceedings will also address the petitioner's claims under § 2255. See Rule 4(a), Rules Governing § 2255 Proceedings. When the trial judge is unavailable, however, another district judge in the district shall address the petitioner's claims under § 2255. Id. Because the district judge who proceeded over Porter's jury trial is deceased, Porter's § 2255 motion was assigned to Judge Conrad who referred this matter to the undersigned.

### B. Ineffective Assistance of Counsel

In order to prove that his counsel's assistance was so defective as to require reversal of his sentence, petitioner must meet a two pronged standard, showing both counsel's deficient performance and resulting prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984). First,

11

he must show that "counsel's representation fell below an objective standard of reasonableness," considering circumstances as they existed at the time of the representation. Id. at 688-89. Petitioner must overcome a strong presumption that counsel's performance was within the range of competence demanded from attorneys defending criminal cases. Id. at 689 (defendant must overcome presumption that, "under the circumstances, the challenged action might be considered sound trial strategy"). In evaluating counsel's performance, the court must be highly deferential to counsel's strategic decisions, avoiding the distorted effect of hindsight. Id. at 689.

Even if he shows that counsel performed deficiently, petitioner is not entitled to relief unless he can satisfy the second Strickland prong by showing that counsel's errors "actually had an adverse effect on [his] defense." Id. at 693. It is not enough to show that an error conceivably could have influenced the result. Id. Counsel's error must have been so egregious as "to undermine confidence in the outcome," given the totality of the evidence before the fact finder. Id. at 694-95. At a minimum, petitioner must demonstrate "a reasonable probability" that, but for counsel's unprofessional errors, the result reached by a reasonable and impartial fact finder would have been different. Id. If a petitioner makes an insufficient showing under either Strickland prong, the court need not inquire into the other. Id. at 697.

Appellate counsel has no constitutional duty to raise on appeal every non-frivolous issue requested by defendant. Jones v. Barnes, 463 U.S. 745, 754 (1983). Ineffective assistance for failing to appeal a given issue must be determined under the Strickland standard of defective performance and prejudice. Murray v. Carrier, 477 U.S. 478, 488 (1986).

### III. DISCUSSION

### A. <u>Allen</u> Charge

Porter states that trial counsel was ineffective for failing to appeal Judge Michael's giving an "<u>Allen</u> charge" to the jury. For the reasons that follow, the undersigned **RECOMMENDS** that the district court deny petitioner's § 2255 motion as to this claim.

The <u>Allen</u> charge takes its name from the Supreme Court's decision in <u>Allen v. United States</u>, 164 U.S. 492 (1896). An <u>Allen</u> charge essentially informs a deadlocked jury that a new trial would be expensive for both sides; that there is no reason to believe that another jury would do a better job; that it is important that a unanimous verdict be reached; and that jurors who are in the minority should consider, without surrendering their convictions, whether the majority's position might be correct. <u>Id.</u> at 501. The decision whether to give an <u>Allen</u> charge is within the sound discretion of the trial court. <u>See</u> <u>United States v. Cropp</u>, 127 F.3d 354, 359 (4th Cir. 1997) (<u>citing</u> <u>United States v. Antonio Burgos</u>, 55 F.3d 933, 935 (4th Cir. 1995)). The United States Court of Appeals for the Fourth Circuit has often stated that "an <u>Allen</u> charge must not coerce the jury, and it must be fair, neutral and balanced," and that

> [c]ourts must be extremely careful not to suggest that jurors give up firmly held convictions, although courts may instruct jurors to reconsider the evidence and the views of other jurors. "The most egregious mistake that can be made in the context of an <u>Allen</u> charge is for a district court to suggest, in any way, that jurors surrender their conscientious convictions."

<u>Id.</u> (quoting <u>Burgos</u>, 55 F.3d at 939); <u>see also</u> <u>Carter v. Burch</u>, 34 F.3d 257, 264-65 (4th Cir. 1994) (discussing the required components of an <u>Allen</u> charge). The Court of Appeals has "often emphasized that a proper and non-coercive [<u>Allen</u>] charge must instruct the jurors in the minority

13

to reconsider the views of the majority and must instruct the majority to reconsider the minority position." Id. (citing Burgos, 55 F.3d at 937, 940; United States v. Sawyers, 423 F.2d 1335, 1342-43 (4th Cir.1970)).[5]

At 2:30 p.m. on Friday, November 19, 2004, after presentation of the evidence, arguments, and instructions in Porter's case, the court recessed as the jury began its deliberations. Four hours later, the court then discussed the need for an Allen charge in-chambers with counsel for the government ("AUSA") and the defendant, as follows:

> THE COURT: I have a note from the jury that came in here at 6:20. It reads as follows: "11/19/04: We agree on Count 1 but we disagree on Count 2."
>
> * * *
>
> That is all I've heard from the jury since they went out. Do you have any suggestions?
>
> [COUNSEL FOR DEFENDANT]: Move for a mistrial.
>
> THE COURT: It's a little early for that.
>
> [COUNSEL FOR DEFENDANT]: With respect to Count 2 only.
>
> THE COURT: It's a little early for that. My inclination is to send back word that I'm going to ask them to consider this matter for one more hour to see if they can reach a verdict. If they can, fine. If not, we'll recess until Monday. That's about the best I can see to do.
>
> Do you have any other suggestions?

---

[5] Courts often refer to a "modified Allen charge"; this refers to the modified, preferred form of the Allen charge that the Fourth Circuit adopted long ago in conformity with the recommendation of the Judicial Conference of the United States. See Sawyers, 423 F.2d at 1342 n. 7 (setting forth an acceptable modified Allen charge). All of the precedents cited above recite the modified Allen charge.

14

[AUSA]: Your Honor, a case as factually straightforward as this, after four hours of deliberation, it may be time to give the modified <u>Allen</u> encouragement for them to work harder, regarding no other jury will ever be in a better position.

* * *

[THE COURT]: You all want to look at it?

[AUSA]: I'm familiar with it.

[COUNSEL FOR DEFENDANT]: Is it the straightforward <u>Allen</u> charge?

THE COURT: Yeah, the real McCoy. That's it. Is it worth giving it to them?

[AUSA]: Judge, I'm just concerned sending them back for a further hour without anymore how to an encouragement would be an exercise in futility. If you give them a little something else to think about, they might accomplish more in the next hour than they did in the previous few.

[THE COURT]: When I turn them loose, I'm going to give them one hour. If they're not back with a verdict by then, we're going to recess until Monday and bring them back in.

Let's go and do that.

(11-19-04 Tr. of Charge Conf. and Jury Instructions at 25-27, Dkt. No. 99). The transcript

indicates that the in-chambers discussion "concluded at 6:35 p.m.," and then "[p]roceedings

continued in the courtroom" with the court providing the following <u>Allen</u> charge to the jury:

Members of the jury, I have your note indicating your disagreement and it concerns the Court, as I know it concerns you and counsel. We've invested this much time in the case and cannot get a resolution.

I'm going to ask you to continue your deliberations for some period of time, but before you return to your jury room, let me encourage you to reach a unanimous decision if it is possible. This

15

case, like all criminal trials, has required a certain amount of time, money and other resources. Should you fail to reach a verdict, the case may have to be tried again and a new trial would unquestionably require additional time, money and resources. There's no reason to believe that any future trial would produce clearer or better evidence. Certainly no reason to believe that a better or more decisive jury could or would be chosen. Specifically, it's unlikely that a jury of twelve men and women could be assembled that are more consciousness [sic] or more impartial or more competent than the twelve of you.

By encouraging you to reach a unanimous verdict if possible, I do not intend to be forcing any of you to abandon clearly held views or convictions. Nor should you conclude that I care or have any opinion about what that verdict should be. I do encourage you, however, to keep an open mind about what the evidence in this case has not been, has not been.

If at this time you find yourself in the minority, please listen and carefully consider the views of the majority. If you find yourself in the majority, then please listen and carefully consider the views of the minority. Whether you're in on the minority or the majority, whether the jury is leaning toward acquittal or toward conviction, you should all keep in mind the value of a unanimous verdict in this case.

Remember at all times, no juror is expected to give up a conscious conviction that he or she may have regarding a defendant's guilt or innocence. But remember also that it is your duty to agree upon the unanimous verdict if this can be done without surrendering any such conviction.

Of course, these comments are not intended to be considered in isolation, but they are to be considered and applied in conjunction with the instructions you've already received. If you have questions about these comments or any other instruction you've been given, you should ask the foreperson, foreman, to write a note and communicate with me in the usual manner.

I'm going – with that supplementary instruction, I'm going to ask you to continue your deliberations for an additional hour. If at that time we've not reached a verdict, then we'll consider what to do at that stage. But for now, with this additional supplemental

instruction, I ask you to go back to the jury room and resume your
deliberations.

Id. at 27-29.

Accordingly, at 6:40 p.m., the jury was excused to resume its deliberations. Counsel for

Porter did not object to the Allen charge. At 7:35 p.m., the court was notified that the jury had

reached a verdict as to both counts, and proceedings continued in the courtroom at 7:40 p.m. to

receive the jury verdict.

Upon close review of the record, there is no basis on which to find that counsel's tactical

decision not to object and appeal to the Allen charge constituted deficient performance under

Strickland. In support of its motion, the government submitted an affidavit wherein Porter's

counsel states that, in his "professional opinion, the Allen-charge was not an appealable issue in

this case." The undersigned agrees that the Allen charge given in Porter's case did not coerce the

jury, and that it was fair, neutral, and balanced. See Cropp, 127 F.3d at 359-60. Judge Michael's

instruction to the jury followed scrupulously the modified Allen charge. There is no reasonable

probability that a challenge to the Allen charge would have succeeded on appeal. Accordingly,

Porter fails to establish his claim of ineffective assistance in this regard, and the undersigned

**RECOMMENDS** that the court deny Porter's § 2255 motion as to claim (a).

### B. Suppression Issue

Judge Michael's opinion published in 2003 reviewed the law applicable to Porter's claim

that the officers' warrantless entry into his residence violated the Fourth Amendment:

> The Fourth Amendment provides that the "right of the people
> to be secure in their persons, houses, papers, and effects, against
> unreasonable searches and seizures, shall not be violated." U.S.
> CONST. AMEND. IV. . . . [W]arrantless entry into an individual's home

17

is presumptively unreasonable. Payton [v. New York], 445 U.S. 573, [586 (1980)].

Warrantless entry of a home may be, however, constitutionally permissible if the intrusion falls within one of the carefully defined exceptions to the warrant requirement. United States v. Cephas, 254 F.3d 488, 494 (4th Cir. 2001). Among the recognized exceptions to the general warrant requirement is the existence of exigent circumstances. Exigent circumstances arise where "law enforcement officers confront a compelling necessity for immediate action that w[ould] not brook the delay of obtaining a warrant." United States v. Wiggins, 192 F. Supp.2d 493, 498 (E.D. Va. 2002) (quoting United States v. Tibolt, 72 F.3d 965, 969 (1st Cir. 1995)). For example, the Fourth Circuit Court of Appeals has held that exigent circumstances justifying warrantless entry exist where "police officers (1) have probable cause to believe that evidence of illegal activity is present and (2) reasonably believe that evidence may be destroyed or removed before they could obtain a warrant." Cephas, 254 F.3d at 494-95.

Yet another judicially recognized exigency justifying warrantless entry occurs when the delay in obtaining a warrant poses a threat to the safety of police officers or of the general public. Wiggins, 192 F. Supp.2d at 501. This "emergency doctrine" permits warrantless entry of a home when the circumstances call for "immediate entry [ ] incident to the service and protective functions of the police, as opposed to, or as a complement to, their law enforcement functions." United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992). . . . For the emergency doctrine to apply, however, the person making the entry must have had an objectively reasonable belief that "an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." Id. Such a belief must exist as of the moment of the officers' entry into a home, with courts taking into consideration "[t]he appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of the officers." United States v. Reed, 935 F.2d 641, 643 (4th Cir. 1991).

Porter, 288 F. Supp. 2d at 719-20. Judge Michael noted that because the existence of exigent circumstances is so dependant on the facts of each case, he found it useful to review other cases in which courts had found, under circumstances similar to Porter's case, an exigency justifying

18

warrantless entry of a home. The opinion recognized that "[p]olice generally have been found to be justified in entering a home in response to a reported burglary or home security alarm, even absent a warrant, so long as the totality of the facts and circumstances support the likelihood that a burglary may be in progress." Id. at 720-21 (citing Reardon v. Wroan, 811 F.2d 1025, 1030 (7th Cir. 1987) (police called to investigate reported burglary in progress at fraternity house while students gone for holiday break, a time when burglaries occurred more frequently, and finding back door unlocked and house completely dark, entered house without warrant; court found these facts constituted exigent circumstances); Bilida v. McCleod, 211 F.3d 166, 171 (1st Cir. 2000) (officer's entry into fenced backyard in response to silent security alarm supported reasonable perception of imminent threat sufficient to justify warrantless entry); United States v. Tibolt, 72 F.3d 965, 970-71 (1st Cir. 1995) (officers responding to a security alarm who inadvertently entered wrong home were nonetheless justified in doing so; security alarm, along with unlocked rear door, supported officers' reasonable suspicion of a possible break-in justifying entry); Murdock v. Stout, 54 F.3d 1437, 1441-42 (9th Cir. 1995) (officers' observation of open patio door and failure to elicit a response from resident when circumstances suggested that a resident should have been present supported finding of probable cause and exigent circumstances), abrogated on other grounds, United States v. Ramirez, 523 U.S. 65 (1998) (rejecting "mild exigency" analysis where entry is accomplished with no property damage); United States v. Johnson, 9 F.3d 506, 509-10 (6th Cir. 1993) (officer's observation of broken window and two individuals inside a residence where officers were responding to burglary report constituted probable cause and exigent circumstance justifying warrantless entry); United States v. Dighera, 2 F. Supp. 2d 1377, 1379-80 (D. Kan. 1998) (officer responding to security alarm, finding front

19

door open, and receiving no response within residence was presented with exigent circumstances permitting immediate warrantless entry).

Judge Michael carefully compared the facts in Porter's case to the other exigent circumstances cases:

> Here, the officers arrived on the scene with the sole understanding that a home security alarm had been activated. These officers had been trained, and properly so, to investigate the alarm and to determine whether any additional signs suggesting a break-in, including an open window or unlocked door, could be observed. The cases noted above suggest that, were these the exclusive circumstances confronting the officers at the time of their arrival, entry following an announcement would be justified under the exigency doctrine. This case, however, presents a somewhat more nuanced set of circumstances in that the officers were confronted with a plausible explanation for the activation of the home security alarm. The court recognizes that, in retrospect, the explanation provided by both Mr. Sutton and Ms. Nei for the triggering of the alarm was perfectly reasonable and consistent with the officers' general observations. Nonetheless, the court is not persuaded that the limited information provided by the defendant's neighbors lead to the conclusion that the officers acted unreasonably in entering the defendant's home without a warrant.

Porter, 288 F. Supp. 2d at 721.

Judge Michael gave three reasons for his determination that exigent circumstances existed. First, the officers' on the spot judgment that further investigation was necessary despite the neighbors' explanation for the alarm was worthy of the deference courts must afford to law enforcement officers. Id. (citing Figg v. Schroeder, 312 F.3d 625, 639 (4th Cir. 2002)). Second, the officers' further investigation "was exactly the type of police work the community would expect, and possibly even demand." Id. (citing Murdock v. Stout, 54 F.3d 1437, 1442 (9th Cir. 1995) ("[W]e are convinced that citizens in the community would have understandably viewed the officers' actions as poor police work if they had left the scene or failed to investigate further

20

at once.")). If someone had been inside the house and in trouble and police had failed to investigate, public outcry would likely have been that they shirked their duties by relying on neighbors' excuses for the alarm. Third, "the activation of an alarm in conjunction with additional information supporting the possibility of a break-in is sufficient to support police officers' determination that an exigency exist[ed]." Id. at 721-22. No one responded to the officers' knocking at the front door. Id. at 718. The officers knew that the alarm was activated by the rear door to the home, and in the course of their investigation found that the rear door was unsecured. Id. Though two individuals at the scene offered a possible explanation for the alarm's activation, neither was the homeowner. Id. "In the face of such circumstances, '[i]t would defy reason to suppose that [law enforcement officers] had to secure a warrant before investigating, leaving the putative burglars free to complete their crime unmolested.'" Id. at 722 (quoting United States v. Singer, 687 F.2d 1135, 1144 (8th Cir. 1982)).

Finding no constitutional violation in the officers' initial entry of the home, Judge Michael then also found no other basis for exclusion of evidence arising from their actions inside the house. Id. The officers' "visual observation of each floor of the home . . . was restricted in scope to that necessary to determine whether a crime was in progress or a resident was in need of assistance" and so did not "exceed[ ] the scope of the justification of the search." Id. Using observations they made during that initial search, officers obtained a warrant under which their second search of Porter's residence survived constitutional scrutiny. Id. (citing United States v. Leon, 468 U.S. 897 (1984); Illinois v. Gates, 462 U.S. 213 (1983)).

Porter claims in his initial § 2255 motion and in his response to the government's motion to dismiss that appellate counsel was constitutionally ineffective for failing to appeal Judge

21

Michael's ruling on his motion to suppress the evidence based on the officers' unreasonable, warrantless entry into his residence. Habeas counsel has also filed a brief in support of this claim (Dkt. No. 94).

Neither Porter's habeas petition nor brief addresses the fact that Porter's trial counsel on the second federal indictment neither moved to suppress the evidence on Fourth Amendment grounds nor sought in some other way to have Judge Michael's suppression ruling on the first indictment adopted, incorporated or otherwise made part of the second federal case. Nor did the United States raise this issue in its motion to dismiss the habeas petition. As stated on the record at the evidentiary hearing in this matter, however, the undersigned is of the view that the failure to raise the suppression motion as regards the second federal indictment or otherwise incorporate Judge Michael's earlier published opinion on this issue is part and parcel of Porter's claim that Porter's counsel did not appeal the denial of his suppression motion. Out of an abundance of caution, however, the court will, by separate order entered this day, allow Porter to amend his § 2255 motion to include counsel's failure to raise the suppression issue in the second federal case.

If counsel had raised the suppression issue in the second case, it is certain that Judge Michael's ruling would not have changed.[6] Thus, the pertinent inquiry for the court is whether counsel's performance was deficient for failing to preserve and appeal the suppression issue, and whether Porter suffered <u>Strickland</u> prejudice as a result. Even if counsel's performance was

---

[6] Indeed, Porter's counsel testified that while the jury was out, the issue of the search came up in conversation between counsel and the court, and Judge Michael announced that "that issue had been decided."

Case 5:04-cr-30045-GEC   Document 106   Filed 03/09/09   Page 22 of 37   Pageid#: 672

deficient,[7] the undersigned **RECOMMENDS** that the district court deny Porter's § 2255 motion as to this claim because there is not a reasonable probability that the Fourth Circuit would have reversed Judge Michael's published opinion on appeal.[8]

In ruling on the suppression motion, Judge Michael carefully applied the exigent circumstances exception as defined by the Fourth Circuit in Moss, 963 F.2d at 677-78. In the Moss case, the Fourth Circuit spelled out the elements of the "emergency doctrine" as an exception to the warrant requirement for officers entering a residence: (1) "the person making entry must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within," and (2) "[a]ny search following warrantless entry for emergency reasons of the type here described must then be limited by the type of emergency involved." Id. at 678. The undersigned finds Judge Michael's application of these legal elements to the facts of Porter's case to have been sound.

The officers were dispatched to Porter's townhouse because its security alarm had been activated by the rear door. The officers investigated the scene, and found that the rear door was unsecured. The owner of the home was not present. Though neighbors provided a possible explanation for the alarm, under the totality of these circumstances, such limited information

---

[7] Though finding it unnecessary to issue a recommendation on Strickland's performance prong, the court notes that Porter's counsel could identify no disadvantage Porter would have faced by preserving and pursuing an appeal on the suppression issue. After all, the argument had already succeeded once, albeit in state court. Judge Michael clearly considered the suppression issue to be worthy of careful consideration, including factual development at a pretrial hearing. He then issued a lengthy, published opinion on the matter.

[8] In considering an appeal of the district court's denial of a motion to suppress, the court of appeals reviews legal conclusions de novo, while reviewing factual findings for clear error. Ornelas v. United States, 517 U.S. 690, 699 (1996); United States v. Rusher, 966 F.2d 868, 873 (4th Cir.1992). Evidence is viewed in the light most favorable to the party who prevailed in the district court. See United States v. Seidman, 156 F.3d 542, 547 (4th Cir.1998).

23

from third-parties did not abrogate the officers' responsibility to confirm that everything and everyone was okay within the residence. As Judge Michael stated, while "police [do not] have license to enter a private residence every time an alarm is activated, they do have a duty to investigate, and, when the facts and circumstances suggest reasonable suspicion that an exigency exists, to enter the home." Porter, 288 F. Supp. 2d at 721-22.

Further, the cases reviewed in detail by Judge Michael illustrate that his decision was consistent with applicable case law. For example, in Tibolt, the First Circuit found that an exigency existed where the indicators of criminal activity closely mirrored those confronting the officers in the present case. An officer was dispatched to a residence because a security alarm had been activated. Tibolt, 72 F.3d at 970. At the scene, the officer "found an unlocked door on the rear deck and received no response to his efforts to communicate with anyone who might be inside." Id. The First Circuit:

> conclude[d] that [the officer] was presented with "exigent circumstances" permitting an immediate warrantless entry. Without entering, he could not know but what [sic] an intruder had managed to get into the residence, and even injured or captured a resident, then fled; or had been caught off guard by the police and remained in the residence with a forcibly detained resident.

Id.

A decision of the Tenth Circuit rendered after Judge Michael's ruling also supports the undersigned's recommendation that there was no reasonable probability that Judge Michael's decision would be reversed on appeal. In United States v. McCullough, 457 F.3d 1150 (10th Cir. 2006),[9] two officers were dispatched to a residence after a security company alerted the police

---

[9] The court's "reasonable probability" evaluation must be made according to the state of the law at the time Porter contends the suppression issue should have been appealed. See United States v. Magleby, 420 F.3d 1136, 1140 (10th Cir. 2005) ("To evaluate this [Strickland] claim, we must examine the state of the law at the time of Mr. Magleby's (continued...)

that its alarm had been activated. Id. at 1155-56. Upon arrival, the officers encountered two individuals – a woman in the driveway and a man exiting a door of the home – who did not claim to be the home owner, but stated that the setting off of the alarm had been an accident, the owner had been contacted, and the security system had been reset. Id. at 1156. The individuals also told the officers that they were working to put up a privacy fence at the house, which would explain their presence and disheveled appearance. Id. One officer entered the home with the woman to examine the alarm panel just inside the front door, and it appeared to the officer that the alarm panel was still active. Id. The officers investigated further, eventually speaking with the purported owner of the residence, in a call placed by the woman at the scene. Id. at 1156-57. The owner stated that people were in fact installing a fence on her property, but seemed surprised by the existence of an alarm and also refused to answer whether the individuals had permission to be inside the home. Id. at 1157. The officers then entered the home a second time to "make sure everything was okay." Id. During this entry, bricks of marijuana were observed in plain view in the basement. Id. A warrant was subsequently obtained, the home owner and her boyfriend McCullough were indicted on multiple drug and gun charges, and both were ultimately found guilty on some counts. Id. at 1157-58.

McCullough appealed the district court's denial of his motion to suppress. Similar to the arguments advanced by Porter, McCullough claimed there was no need for the officer's "initial entry because she had already received a reasonable explanation from [the woman at the scene]

---

[9](...continued)
direct appeal – which was decided on March 7, 2001 – and the specific circumstances of this case."). However, the court's consideration of McCullough is appropriate because it would have been law at the time the Fourth Circuit would have decided the suppression issue. McCullough was filed on August 10, 2006, more than three months before Porter's direct appeal was decided on November 17, 2006.

Case 5:04-cr-30045-GEC   Document 106   Filed 03/09/09   Page 25 of 37   Pageid#: 675

that she was working on a privacy fence, and this explanation was effectively verified because of

the obvious construction in the yard and the fact [that the two individuals at the scene] were dirty

from the construction of the fence." Id. at 1163-64 (internal citations omitted). Further,

McCullough argued that, "[e]ven if the initial entry into the residence was permitted in order to

check the burglar alarm, [the officer's] renewed entry and search of the basement without a

warrant was not supported by exigent circumstances," because the officer "received a logical

explanation from [the woman at the scene] as to her presence at the residence and why the alarm

was triggered and that explanation was corroborated by a phone call to [the owner]." Id. at 1164

(internal quotations omitted). Despite the presence of a possible explanation for the alarm signal,

the Tenth Circuit affirmed the district court's denial of McCullough's suppression motion. It

found that "[t]aking into account all of the [ ] circumstances," both the initial and subsequent

entries were justified by exigent circumstances. Id. at 1164-65. Similarly, despite the

explanations provided by two neighbors as to the cause of alarm at the Porter home, the officers'

entry in this case was justified as an emergency based upon all the circumstances.

Additionally, the Porter decision has not met any criticism in subsequent reported

decisions.[10] Indeed, Porter has been commented on favorably by other courts considering similar

issues. In fact, the district court opinion affirmed by the Tenth Circuit in McCullough discussed

the Porter decision in great detail and found "Judge Michael's reasoning to be persuasive and his

holding consistent with the Tenth Circuit's law discussing the general parameters of the exigent

---

[10] The only cautionary treatment history noted on Westlaw for the Porter decision is Judge Michael's own
opinion in United States v. Gillespie, 332 F. Supp 2d 923, 928 (W.D. Va. 2004), where he distinguished his earlier Porter
decision.

26

circumstances exception to the warrant requirement." United States v. McCullough, No. 04-20006-01-JWL, 2004 WL 1088777, at *5 (D. Kan. May 14, 2004).

Judge Michael's Porter decision was cited as well in United States v. Brown, 449 F.3d 741, 749 (6th Cir. 2006), in which the Sixth Circuit held that the triggering of a burglar alarm twice in a relatively short period of time, the absence of the owner, the sounding of an alarm and an open basement door provided an objectively reasonable basis to believe that a burglary was in progress and justified the warrantless entry. Id. at 748-49.[11] As in Porter, the officer entered the basement to conduct a protective sweep and check for intruders. Id. at 746. After smelling marijuana, the officer opened an ajar interior basement door and discovered an indoor marijuana growing operation. Id. at 746-47. In Brown, the Sixth Circuit held that exigent circumstances justified the brief and cursory inspection of the premises, including the interior room in the basement where an intruder could be hiding or a resident restrained. Id. at 750.

The Supreme Court of Arkansas similarly found probable cause and exigent circumstances to exist when an officer entered a residence where a burglar alarm had sounded. Steinmetz v. State of Arkansas, 366 Ark. 222, 234 S.W.3d 302 (2006).[12] There the officer found an open door and no one at home. The opinion recites that "[i]n accordance with the policy of the Sheriff's Office, he entered the home to check and make certain that no one was there committing a crime or in need of help." 234 S.W.3d at 303. As in Porter, the officer found narcotics in plain view in an interior room. The Arkansas Supreme Court discussed the Porter opinion at length, concluding that it "agree[d] with the reasoning of the federal district court in Virginia." Id. at 306.

---

[11] Brown was filed on May 31, 2006, months before Porter's direct appeal was decided.

[12] Steinmetz also was decided prior to Porter's direct appeal, being filed on April 27, 2006.

27

Likewise, in Hunter v. Trussel, No. 2:03-CV-00972, 2006 WL 1209374 (S.D. Ohio May 2, 2006), the district court, relying heavily on Porter, found no Fourth Amendment violation to exist where an officer responding to a call from a burglar alarm company entered an unlocked door at a residence and discovered inside two marijuana plants. Addressing Porter extensively, the court found that "[e]xigent circumstances existed for [the officer] to enter the premises." Id. at * 5-7.[13]

Contrary to Porter's argument, the court's recent opinion in Hunsberger v. Wood, 564 F. Supp. 2d 559 (W.D.Va. 2008), does not call for a different result.[14] The facts in Hunsberger are a far cry from those presented here. In Hunsberger, officers responded to a neighbor complaining of noise, and kids in cars coming and going from the Hunsbergers' house. Id. at 563. Two officers responded at 10 p.m., found two cars parked in front of the house, the house lights on, no noise, and nothing to substantiate the complaint. Id. The officers left after five minutes. Id. Two hours later, the neighbor again called the police reporting further activity and noise. Id. Again, the officers perceived no noise, the lights were on in the house, and three cars were parked in the road in front of the house. The officers rang the door bell repeatedly receiving no answer, and then looked around the house, including inside the garage, and found nothing amiss other than a

_____

[13] Although only cases decided prior to November 17, 2006 would have been available to the Fourth Circuit before Porter's appeal was decided , the court finds it relevant that no decision since that time has suggested that Judge Michael's decision was incorrect. Indeed, as recently as September, 2008, the Porter opinion was followed by a district court in this circuit justifying the warrantless entry into a residence under exigent circumstances. United States v. Waldron, No. 7:07-CR-101-2-FL(3), 2008 WL 4154306 (E.D.N.C. Sep. 5, 2008). Waldron did not involve an officer dispatched to investigate a burglar alarm, but rather an officer sent to investigate a call that suspicious persons or vehicles were behind a residence. Id. at *1. Seeing neither on arrival, the officer knocked on an unsecured back door, announced himself and entered the residence to investigate whether a burglary was in progress. Id. Upon entry, the officer saw various contraband, including drug paraphernalia and ammunition, in plain view. Id. The court justified the entry under the emergency doctrine. Id. at *2-3.

[14] Hunsberger was filed over 18 months after Porter's appeal was decided.

Case 5:04-cr-30045-GEC   Document 106   Filed 03/09/09   Page 28 of 37   Pageid#: 678

trash bag containing beer cans in the yard. Id. at 563-64. Suspecting an underage drinking party, the officers had dispatch call the owners of the cars parked out front and inform the parents of their suspicions. Id. at 564. One of the parents called arrived shortly thereafter, concerned that his stepdaughter was supposed to be staying elsewhere. Id. After again trying to get a response by beating on the door, an officer and the parent entered the home. Id. Finding some evidence of drinking inside the house, the officer and parent then proceeded to search the home, looking for the daughter. Id. at 564-65. After entering an upstairs bedroom, the two men frightened a small child, awakening and upsetting her parents sleeping down the hall. Id. at 565. Unlike in Porter, there was no report of a tripped alarm or other evidence in Hunsberger to suggest that criminal activity such as a burglary, constituting an exigent situation justifying an exception to the warrant requirement, was going on. Instead, the court found some "support for the proposition that a reasonable officer under the circumstances would have concluded that the Hunsbergers' home was simply the scene of an underage drinking party." Id. at 569 n.2. The court distinguished other cases in which exigent circumstances was found, including Porter, noting that "[t]hese warrantless entries were constitutional only insofar as they were required by the exigent circumstances." Id. n.3. Of interest, the opinion in Hunsberger stopped short of holding that the initial entry by the officer and parent into the home was unconstitutional, concluding instead that "even if [the officer's] initial entry could be viewed as objectively reasonable, his findings once inside, at least before he entered the bedroom of he Hunsbergers' daughter and probably before,

29

should have dispelled any reasonable belief that an emergency, in fact, existed justifying further intrusion."[15] Id. at 568. In short, Hunsberger does not support Porter's argument in this case.

Porter also argues that Smith's assistance was constitutionally ineffective for failing to obtain and review a copy of the transcript of the federal suppression hearing. Porter stresses that counsel's failure to do so prejudiced him because Judge Michael's opinion does not mention that there was a Winchester Police Department policy requiring the officers to enter Porter's townhouse when the burglar alarm went off. While the court does not reach the question of whether Porter's counsel's performance was deficient,[16] there are two reasons why Porter's argument fails as to Strickland's prejudice prong.

First, the undersigned disagrees with Porter's characterization of the evidence from the suppression hearing regarding the Winchester Police Department "policy" of responding to a report from a burglar alarm company. Both Officer Brunson and Sergeant Danielson testified that the Winchester Police Department had no written policy regarding responding to residential alarms, but did have an unwritten standard operating procedure. Danielson testified that two officers are dispatched to the alarm site and "when they arrive, they're to check the residence, business, what it be, to find any signs of a burglary or a crime in progress or for unsecured

---

[15] There can be no credible argument that the scope of the interior search in this case went too far, in contrast to the facts in Hunsberger. The officers made a protective sweep and were in Porter's townhouse approximately five minutes. They found three bags of marijuana in plain view on the kitchen table on the first floor and a large quantity of currency on top of the dresser on the second floor. After they completed their protective sweep, they left the residence and secured it until a search warrant could be obtained.

[16] Smith testified that he met with Porter's former counsel, Thomson, and Porter and thoroughly discussed the suppression issue with both of them. Smith also studied Judge Michael's published opinion and the briefs filed on the suppression issue. Thomson represented Porter on the suppression issue both in the state and federal court, and Smith had extensive discussions with him, both when Smith took over as counsel for Porter and throughout the case, including during the trial. Given Thomson's knowledge and involvement with the suppression issue and Smith's close working relationship with him, it may well have been reasonable for Smith to rely on Thomson to provide him the salient facts regarding the suppression issue.

windows or doors." (8-15-03 Supp. Hrg. Tr. at 40, Case No. 5:03cr30035, Dkt. No. 40). On
cross-examination, Danielson testified as follows:

> Q.     Is it your testimony that in every instance where there is an
>        alarm going off in a home that you enter without permission?
>
> A.     If we find an unsecured door or an open window, something to
>        that effect.

Id. at 43. In short, there was not, as Porter suggests, a policy that the Winchester police make a
warrantless entry into every home where a burglar alarm sounds. Rather, other facts must be
present, such as an unsecured door or window, to suggest that a crime was in progress or that
someone needed assistance. That is, in fact, precisely what happened in this case.

Second, contrary to Porter's argument, Judge Michael's opinion describes this very
practice of the Winchester police. While the decision does not specifically use the word "policy,"
Judge Michael's decision reflected the same when he noted that the "officers had been trained,
and properly so, to investigate the alarm and to determine whether any additional signs suggesting
a break-in, including an open window or unlocked door, could be observed." Porter, 288 F. Supp.
2d at 721. The opinion recognized that the circumstances of this case were further "nuanced" in
that the officers obtained from neighbors a plausible explanation for the sounding of the alarm,
but the court determined that the officers' judgment to investigate further was worthy of
deference. Id. The court further noted that:

> [I]n the face of an alarm, officers may reasonably conclude that a
> burglary may be in progress and may conclude, as here, that a
> neighbor's explanation to the contrary is not entirely credible. While
> this court by no means suggests that the police have license to enter a
> private residence every time an alarm is activated, they do have a duty
> to investigate, and, when the facts and circumstances suggest
> reasonable suspicion that an exigency exists, to enter the home.

31

Id. at 721-22. As Judge Michael's opinion recounts, the reasonable objective facts and circumstances present in this case justifying the entry into the Porter townhouse were, taken in combination: (1) the activation of the alarm, (2) the unlocked back door, (3) the lack of any response to the officer's knocking on the door and announcing their presence, and (4) the officers' evaluation of the credibility of the neighbors' explanation for the alarm's activation. As the decision explains, this was not a case where the entry was based solely on the report of the alarm and rote application of department policy. Judge Michael's opinion expressly requires "additional information" beyond the mere sounding of the alarm, and finds it in the unsecured back door, the lack of any response from the interior, and the peculiar explanation from the neighbors. Id. at 721. Under such circumstances, Judge Michael's opinion was well-grounded in Fourth Amendment jurisprudence.

Finally, in his opposition brief, Porter also points to several other alleged facts in an attempt to call into question Judge Michael's opinion: Brunson observed no signs of forced entry; the officers did not express concern for their own safety or indicate any fear for neighbors' safety; Brunson knew that the alarm company could and would likely contact the key holder about the alarm, such that the key holder would likely be en route to the residence; the alarm company did not report any additional alarms from motion sensors inside the house; the neighborhood included mostly middle class, African-American residents;[17] and during the search, Brunson looked inside the closets, although he observed no signs of damage or burglary. (Opp. Br. at 5-10, Dkt. No. 81).

---

[17] Porter asserts that because the eye witnesses were African-American, the officers did not believe their reports that a child triggered the alarm. He does not cite to any specific evidence, however, indicating that race factored into the officers' decision to search the house in light of the activated alarm and the unsecured door.

32

There are a many reasons why these claimed facts do not vitiate the result reached by Judge Michael that the officers' decision to conduct immediate further investigation was reasonable. The absence of any sign of forced entry or other obvious criminal activity does not render unreasonable the officers' belief that a possible emergency existed. To the contrary, officers could have reasonably believed that a burglar had entered through the alarmed but unlocked rear door, or that someone in the residence had opened the door for a perpetrator and had been a victim of violence at the hands of that perpetrator, who triggered the alarm as he left the house. The officers might reasonably have suspected at the time that neighbors who were offering an explanation for the alarm could have been protecting some other person who had actually triggered the alarm. Moreover, while the neighbors offered an explanation for the tripping of the alarm, no one explained to the officers why the back door was unsecured. While the officers did not express concerns for themselves or the neighbors, they plainly had concerns over the possible silent occupants of the Porter townhouse. Officer Brunson testified that he had no knowledge whether the alarm company had actually made contact with Porter as the key holder or that he was in a position to come immediately to the house. (8-15-03 Supp. Hrg. Tr. at 19). Porter's reference to the search of the closets is a red herring as neither the gun nor marijuana were found there. Regardless, given that the officers were investigating a suspected burglary, a closet provides an attractive hiding place for a would-be burglar interrupted in the act by an alarm and the sounds of officers entering the house.

In short, that Porter has not demonstrated any reasonable probability that his arguments would have been sufficient to persuade the Fourth Circuit to reverse Judge Michael's rulings on the suppression issue. Thus, Porter cannot demonstrate that counsel's failure to challenge the

33

suppression motion on appeal resulted in prejudice under <u>Strickland</u>, and accordingly, it is

**RECOMMENDED** that the court deny Porter's § 2255 motion as to claim (b).

### C. Petition for <u>Certiorari</u>

In claim (c), Porter asserted that counsel was ineffective for failing to apply for <u>certiorari</u>

to the Supreme Court of the United States after the Fourth Circuit affirmed his conviction.

However, after the court referred this issue to the undersigned Magistrate Judge for an evidentiary

hearing, Porter moved to withdraw this claim, and this motion was granted. Accordingly, this

issue is no longer before the court.

### D. Firearm Possession

In claim (d) of the § 2255 motion, Porter claims that defense counsel was ineffective in

failing "to argue that the marijuana and [the] gun had nothing to do with the [distribution of]

marijuana" without specifying the proceeding in which this alleged omission occurred. (§ 2255

Mot. at 9, Dkt. No. 71). In his response to the motion to dismiss, Porter lumps this claim together

with the claim that counsel failed to file a <u>certiorari</u> petition. He asserts that the government did

not demonstrate "linkage of the firearm to furtherance of any drug trafficking" other than the fact

that the firearm [was] located within the same room and vicinity as the drugs." (Opp. Br. at 15).

He also asserts that "[t]here was no rationale [sic] connection in support of the Court of Appeals

for the Fourth Circuit's decision." <u>Id.</u>

To the extent that Porter claims ineffective assistance by counsel at trial or on appeal, his

assertions are contradicted by the record. The trial transcript and the opinion of the Court of

Appeals affirming the conviction illustrate vigorous effort by Porter's attorney, both at trial and on

appeal, to disentangle Porter's possession of the marijuana from his possession of the firearm.

34

(11-19-04 Trial Tr. at 3-9, Dkt. No. 49); Porter, 206 Fed. App'x at 261. The Fourth Circuit affirmed the § 924(c) conviction, finding "that a reasonable jury could conclude that Porter's possession of the firearm was to further drug trafficking," given that "[t]he .45 caliber pistol with a fully loaded magazine, but empty chamber, was found on Porter's kitchen counter next to digital scales and within close proximity to a large amount of marijuana." Porter, 206 Fed. App'x at 261. Porter fails to point to any specific and viable argument that counsel should have made at trial or on appeal that would have persuaded the court to reach a different outcome. Thus, these claims fail under both prongs of Strickland. To the extent that Porter is arguing that counsel should have raised the sufficiency argument in a petition for a writ of certiorari, such claim is no longer before the court. Accordingly, the undersigned **RECOMMENDS** that the district court deny Porter's § 2255 motion as to claim (d).

### E.  Other Jury Claims

In his response to the motion to dismiss, Porter raises additional claims, arguing that counsel should have challenged on appeal other errors the court made in dealing with the jury: (1) failing to give a required reasonable doubt instruction, (2) failing to instruct jurors to exclude every reasonable hypothesis other than guilt when weighing circumstantial evidence, and (3) failing to offer a rationale for sending the written jury instruction on Count Two into the deliberation room in response to a jury note, contrary to the court's common practice. (Opp. Br. at 4-5). To the extent that Porter's presentation of these new claims might be construed as a motion to amend the § 2255 action, the motion is untimely under 28 U.S.C. § 2255(f)(1).

Porter's conviction became final on March 12, 2007, upon the expiration of the period within which he could have filed a petition for certiorari with the Supreme Court of the United

35

States after the United States Court of Appeals for the Fourth Circuit affirmed his conviction. <u>See</u> 28 U.S.C. § 2255(f)(1); Sup. Ct. R. 13(1); Mandate of Fourth Circuit, Dkt. No. 70. Porter first presented these new claims in his response filed on April 28, 2008, outside the one year filing period provided by § 2255(f). An untimely amendment to a pending § 2255 motion may relate back to a timely raised claim, pursuant to Rule 15(c) of the Federal Rules of Civil Procedure, provided that the untimely claim arises from a common core of operative facts necessary to one or more timely filed claims. <u>See</u> <u>Mayle v. Felix</u>, 545 U.S. 644, 664 (2005). The new jury instruction issues that Porter has raised are completely separate, factually and legally, from the <u>Allen</u> charge issue that he pursued in his initial § 2255 pleading. Therefore, by separate order, the undersigned **DENIES** Porter's proposed amendment as to these claims.

### IV. Conclusion

For the stated reasons, the undersigned Magistrate Judge **RECOMMENDS** that the court deny Porter's § 2255 motion in its entirety.

The Clerk is directed to transmit the record in this case to Honorable Glen E. Conrad, United States District Judge. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk is directed to send copies of this Report and Recommendation to counsel of record for the parties.

Enter this _____ day of _____, 2009.

_____
Michael F. Urbanski
United States Magistrate Judge